UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRAVELERS PROPERTY CASUALTY COMPANY OF
AMERICA,

Plaintiff,

-v-

NETHERLANDS INSURANCE COMPANY,

Defendant.

21 Civ. 6061 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Travelers Property Casualty Company of America ("Travelers"), an insurance

company, brings this lawsuit against Netherlands Insurance Company ("Netherlands"), another

insurance company. Travelers seeks a declaration that Netherlands is obligated to defend and

indemnify three non-parties—J.T. Magen & Company, Inc. ("J.T. Magen"), Mayer Brown LLP

("Mayer Brown"), and 1221 Avenue Holdings, LLC ("1221 Holdings")—in a New York state-

court personal-injury lawsuit. Travelers has been providing a defense to J.T. Magen, Mayer

Brown, and 1221 Holdings in that action, which involves claims from a housekeeper who alleges

that she sustained an injury while working in Mayer Brown's corporate offices. Travelers has an

insurance policy with J.T. Magen, a construction company that contracted with Mayer Brown to

perform renovations in Mayer Brown's offices; Netherlands has an insurance policy with

Division Ten, a non-party that worked for J.T. Magen as a subcontractor on that renovations

project. Netherlands denies a duty to defend or indemnify J.T. Magen, Mayer Brown, and 1221

Holdings in connection with the state-court suit.

Pending before the Court are (1) Travelers's partial motion for summary judgment on the

issue of Netherlands's duty to defend, and (2) Netherlands's cross-motion for summary judgment

in full.  For the reasons that follow, the Court denies Travelers's motion and grants Netherlands's

motion, save for an outstanding issue relating to reimbursement of Netherlands's fees and costs

associated with defending itself in this declaratory judgment action.

## I.     Background

### A.      Factual Background[1]

#### 1.     The Claimed Injury and an Overview of the State Court Action

In March 2015, non-party Hajdine Shuku ("Shuku") worked as a housekeeper for non-

party Pritchard Industries.  JSF ¶ 48.  Shuku claims that, on March 10, 2015 at approximately 11

p.m., she sustained injuries while performing janitorial services on the 12th floor of a

commercial office space.  *Id.* ¶¶ 18–19, 47.  While cleaning a bathroom, she alleges, a stall door

fell off and hit her.  *Id.* ¶ 47.  The incident allegedly occurred in the office spaces of non-party

---

[1] The Court draws its account of the underlying facts of this case from the parties' submissions in support of and in opposition to the parties' summary judgment motions.  These include: (1) in support of Travelers's motion for partial summary judgment, Travelers's memorandum of law, Dkt. 32 ("Travelers Mem."), and a supporting declaration; (2) in support of Netherlands's motion for summary judgment and in opposition to Travelers's motion, Netherlands's memorandum of law, Dkt. 41 ("Netherlands Mem."); (3) in opposition to Netherlands's motion and in further support of its motion, Travelers's reply memorandum, Dkt. 42 ("Travelers Reply"); and (4) in further support of Netherlands's motion, Netherlands's reply memorandum ("Netherlands Reply").  The Court also draws its account of the underlying facts from the parties' joint stipulated facts, Dkt. 30 ("JSF"), as well as the parties' individual Rule 56.1 statements.

Citations to a party's Rule 56.1 statement incorporate by reference the materials cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Mayer Brown, a law firm. *See id.* Mayer Brown leases floors 11–14 at 1221 Avenue of the Americas, New York, New York from 1221 Holdings.

In or about August 2016, Shuku commenced a negligence action against Mayer Brown and 1221 Holdings in New York State Supreme Court. *Id.* ¶ 50. Thereafter, Shuku joined two additional defendants, J.T. Magen and Division Ten—both non-party construction companies believed to have performed work in the Mayer Brown office bathrooms in some capacity before Shuku's injury. *See id.* ¶¶ 51, 53. On or about May 9, 2017, Shuku joined J.T. Magen. *Id.* ¶ 51. On or about March 8, 2018, Shuku joined Division Ten. *Id.* ¶ 53. The four defendants in the state-court action—J.T. Magen, Mayer Brown, 1221 Holdings, and Division Ten—have, in turn, asserted third-party claims against another non-party construction company—a subcontractor of Division Ten—that is alleged to have performed work in the Mayer Brown offices: Met Sales & Installation Corp. ("Met Sales"). *Id.* ¶ 55; *see id.* ¶ 49.

### 2.   The Construction Project

On or about February 1, 2014, Mayer Brown contracted with J.T. Magen for construction work in the Mayer Brown offices. *Id.* ¶¶ 20–21. On or about August 5, 2014, Division Ten signed a purchase order to perform subcontractor work for J.T. Magen on the Mayer Brown project (the "Purchase Order"). *Id.* ¶ 22. Although Division Ten signed the purchase order, it never received back, in 2014 or 2015, a countersigned copy from J.T. Magen. *Id.* ¶¶ 23–24. On or about September 30, 2021, J.T. Magen signed the Purchase Order. *Id.* ¶ 30.

The Purchase Order described two aspects to the construction work: furnishing and installing toilet partitions and furnishing and delivering toilet accessories. *Id.* ¶ 32. Division Ten's only responsibility under the Purchase Order was to install the toilet partitions. *Id.* ¶ 33. Division Ten's subcontractor, Met Sales, "actually installed the toilet partitions on site; Division

3

Ten employees did not actually do any work" at the job site. *Id.* ¶ 34. By December 19, 2014, the scope of work under the Purchase Order regarding the furnishing and installation of the toilet partitions was completed. *Id.* ¶ 36.

Several months later, in March 2015, Mayer Brown, J.T. Magen, and Division Ten emailed about issues in the bathrooms. *See id.* ¶¶ 57–60. On March 6, 2015, a representative of Mayer Brown emailed a representative of J.T. Magen, stating in part:

> Last week we had at least 2 people (that I know of) get stuck in a bathroom stall on the 12th and 11th floors. Today, one of our maintenance clerks was stuck in a stall on the 14th floor. Lucky for him, he had a screw driver and was able to get out without additional help. Please schedule your contractor to come back first thing next week to service all bathroom locks in the men and women rooms on floor [unreadable] need to sign [unreadable] fully operational and are [unreadable] manufacturer's specifications.

*Id.* ¶ 59 (bracketed materials in original). On March 7, 2015, a representative of J.T. Magen[2] forwarded the message from Mayer Brown to a Division Ten representative. *Id.* On March 9, 2015, a representative of Division Ten wrote back to the J.T. Magen representative, stating, "[W]e just want to make sure that any 'punch list'/warranty items are fully covered off." *Id.* ¶ 60.

A few months later, on or about June 25, 2015, J.T. Magen issued a document entitled "Subcontractor Change Order" to Division Ten. It called for work at the Mayer Brown job site involving "[f]urnish[ing] and install[ing] painted angle L's in custom lengths to remove sight lines in the 11th, 12th, 13th, and remaining bathrooms on the 14th floor." *Id.* ¶ 61. This directive had been not included in the work described in the Purchase Order. *Id.* ¶ 63. On or

---

[2] The JSF identifies the representative as "Steven Smith." He is initially described there as a representative of Mayer Brown, *see* JSF ¶ 59, but in the next paragraph, he is identified as a representative of J.T. Magen, *see id.* ¶ 60. Based on the totality of the record and the phrasing of the admissions in paragraphs 59 and 60, the Court understands that he is a representative of J.T. Magen, and that the reference to Mayer Brown in paragraph 59 was in error.

about June 25, 2015, the same day it received the document from J.T. Magen, Division Ten signed the Subcontractor Change Order, *id.* ¶¶ 62, 69, and work began thereafter, *id.* ¶ 70. The Subcontractor Change Order set a price in connection with the work to be performed under it. *Id.* ¶ 68. J.T. Magen did not countersign the Subcontractor Change Order. *Id.* ¶¶ 64–65.

### 3.    The Insurance Policies and Tender

The indemnification dispute implicates several insurance policies and certificates of liability.

First is the insurance policy Travelers issued to J.T. Magen (the "Travelers Policy"). That policy provided J.T. Magen with "commercial general liability coverage" for the policy period of September 30, 2014 to September 30, 2015. *Id.* ¶ 1. Only J.T. Magen—not Mayer Brown nor 1221 Holdings—qualifies as a Named Insured (that is, a person or entity to whom Travelers explicitly extends coverage under the policy). *See id.* ¶¶ 2–3. "Subject to certain terms, conditions, and exclusions, the Travelers Policy provides coverage for bodily injury that takes place during the policy period and is caused by an accident." *Id.* ¶ 4. The Travelers Policy contains an endorsement that, under certain terms and conditions, limits the general liability coverage it provides to "excess over any of the other insurance." *Id.* ¶ 5.

As to coverage that might reach beyond the Named Insured, the policy contains an endorsement that, under certain terms and conditions, extends the scope to "any person or organization" the Named Insured is "required to include as an additional insured on this policy by written contract or written agreement in effect during this policy period and signed and executed by [the Named Insured] prior to the loss for which coverage is sought." *Id.* ¶ 6. The coverage under that endorsement, subject to certain terms and conditions, is also as excess over other insurance available. *Id.*

Second is the insurance policy Netherlands issued to Division Ten (the "Netherlands Policy"). That policy provides Division Ten with "[c]ommercial [g]eneral [l]iability [c]overage" for the policy period of September 1, 2014 to September 1, 2015. *Id.* ¶ 7. "Subject to certain terms, conditions, and exclusions, the Netherlands Policy provides coverage to entities or persons qualifying as insureds for bodily injury that takes place during the policy period and is caused by an accident." *Id.* ¶ 8. Only Division Ten—not J.T. Magen, Mayer Brown, nor 1221 Holdings—qualifies as a Named Insured under the Netherlands Policy. *Id.* ¶ 9.

As to coverage that might reach beyond the Named Insured, the policy contains three relevant endorsements. First is an endorsement titled "Additional Insured—Owners, Lessees[,] or Contractors—Scheduled Person or Organization" (the "Netherlands Scheduled Person Endorsement"). It, under certain terms and conditions, extends coverage to individuals and organizations working on behalf of the Named Insured at a particular job site. *Id.* ¶¶ 10–11 (cleaned up). Second is an endorsement titled "Additional Insured—Owners, Lessees[,] or Contractors—Automatic Status When Required in Construction Agreement with You" (the "Netherlands Blanket AI Endorsement"). It, under certain terms and conditions, extends coverage to individuals and organizations whom the Named Insured has "agreed to add as an additional insured in a written contract or written agreement." *Id.* ¶¶ 12–13 (cleaned up). This endorsement sets forth two scenarios under which insurance under the Netherlands Policy would be either primary or excess to other insurance carried by the additional insured. *See id.* Third is an endorsement titled "Additional Insured—Automatic Status When Required in Construction Agreement with You—Contractors—Completed Operations" (the "Netherlands Completed Operations Endorsement"), which, under certain terms and conditions, extends coverage to individuals and organizations whom the Named Insured has "agreed to add as an additional

insured in a written contract or written agreement" with respect to liability for "bodily injury" or "property damage" caused by the Named Insured's work "performed for that additional insured that is the subject of the written contract or agreement." *Id.* ¶¶ 14–15. This endorsement sets forth two scenarios under which insurance under the Netherlands Policy is primary or excess to other insurance carried by the additional insured. *See id.*

Third and fourth are certificates of liability issued by non-party Vreeland Insurance, Inc., both dated December 10, 2014, to Division Ten as the "Insured." *Id.* ¶¶ 41–44. Before these were issued, J.T. Magen had emailed Division Ten "insurance requirements" regarding the project at "Mayer Brown LLP @ 1221 Avenue of the America, NYC." *Id.* ¶ 25; *see id.* ¶¶ 26–28, 39–40. The certificates of liability, collectively, name 1221 Holdings, J.T. Magen, and Mayer Brown as "additional insured[s] in connection with all work performed at 1221 Avenue of the Americas" "[w]ith respect to work performed by the insured." *Id.* ¶¶ 42, 44.

On various occasions between November 2016 and June 2019, Travelers has tendered to Netherlands on behalf of J.T. Magen, Mayer Brown, and 1221 Holdings in connection with the state-court action, seeking both defense and indemnification under the Netherlands Policy. *See* ¶¶ 73–80. Netherlands has denied an obligation to defend or indemnify J.T. Magen, Mayer Brown, or 1221 Holdings for Shuku's lawsuit. *See id.* ¶¶ 81–83.

### B.      Procedural History

On July 15, 2021, Travelers initiated this declaratory judgment action. Dkt. 1. On September 10, 2021, Netherlands answered. Dkt. 9. On October 4, 2021, the Court held an initial pretrial conference, *see* Dkt. 10, and issued a case management plan and scheduling order, Dkt. 13. On January 20, 2022, Dkt. 16, and again on February 24, 2022, Dkt. 18, the Court extended the deadline for fact discovery. On April 7, 2022, both parties filed letters anticipating

respective motions for summary judgment. Dkts. 19–20. On May 5, 2022, the Court held a pre-motion conference, *see* Dkt. 26, and set a briefing schedule for the motions, Dkt. 27.

On June 9, 2022, the parties filed a joint statement of stipulated facts. Dkt. 30. On June 16, 2022, Travelers moved for partial summary judgment. Dkts. 32–34; *see* Dkt. 35 (motion refiled). On July 1, 2022, Netherlands cross-moved for summary judgment and opposed Travelers's motion. Dkts. 36–41. On July 15, 2022, Travelers replied to Netherlands's motion. Dkts. 42–45. On July 26, 2022, Netherlands replied to Travelers's motion. Dkts. 46–47.

## II.    Applicable Legal Standards

### A.    Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### B.    Principles for Interpreting Insurance Policies Under New York Law

New York law governs interpretation of the two policies at issue. *See* Travelers Mem. at 12–13; Netherlands Mem. at 4–5. "The construction of an insurance contract is ordinarily a matter of law to be determined by the court." *U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc.*, 256 F. Supp. 2d 176, 180 (S.D.N.Y. 2003) (citing *Town of Harrison v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 89 N.Y.2d 308, 316 (1996)). In resolving a summary judgment motion involving contract interpretation, "a court should accord [contract] language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)).

When contract language is unambiguous, "the district court [may] construe it as a matter of law and grant summary judgment accordingly." *Id.* But, if policy language is ambiguous, New York law provides that such ambiguities must be construed in favor of the insured and against the insurer. *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010); *Handelsman v. Sea Ins. Co.*, 85 N.Y.2d 96, 101 (1994) ("Where there is

ambiguity as to the existence of coverage, doubt is to be resolved in favor of the insured and against the insurer.").

Whether a contract is ambiguous is a threshold question of law for the court. *Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006). "Language in an insurance contract will be deemed ambiguous if reasonable minds could differ as to its meaning." *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998). The Second Circuit has explained that "ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).

Where the language of a contract is held ambiguous, the factfinder may properly consider "extrinsic evidence as to the parties' intent." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009); *see also Collins v. Harrison–Bode*, 303 F.3d 429, 433–34 (2d Cir. 2002) ("[W]here . . . there are internal inconsistencies in a contract pointing to ambiguity, extrinsic evidence is admissible to determine the parties' intent.") (citation omitted). "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder." *JA Apparel Corp.*, 568 F.3d at 397 (citing *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 574 (2d Cir. 1993)); *accord Compagnie Financiere*, 232 F.3d at 158; *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) ("In determining the meaning of an ambiguous contract term, the finder of fact seeks to fathom the parties' intent. That intent

may be proven by extrinsic evidence."); *see also Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) (summary order).

## III.   Discussion

In its partial motion for summary judgment, Travelers argues that it is entitled to a declaration that Netherlands is obligated to defend Mayer Brown, 1221 Holdings, and J.T. Magen in the underlying personal injury action, and that Netherlands's coverage obligation is primary to Travelers's coverage obligation.  In its motion for summary judgment in full, Netherlands seeks a declaration that it does not owe a duty to defend or indemnify Mayer Brown, 1221 Holdings, and J.T. Magen in the underlying action.  It also seeks "the costs and disbursements of this action."  Netherlands Reply at 1.

The central issue on which these motions turn is whether any or all of Mayer Brown, 1221 Holdings, and J.T. Magen qualify as additional insureds under the Netherlands Policy.  To the extent the Court finds that any of these non-parties qualifies as an additional insured under the Netherlands Policy, then the Court must determine, as between the Netherlands and Travelers policies, which entity's coverage obligations are primary.

The additional-insureds inquiry requires interpreting and applying three endorsements in the Netherlands Policy: the Netherlands Scheduled Person Endorsement; the Netherlands Blanket AI Endorsement; and the Netherlands Completed Operations Endorsement.  Travelers argues that J.T. Magen qualifies as an additional insured under the first endorsement, and that Mayer Brown, 1221 Holdings, and J.T. Magen qualify as additional insureds under the second and third endorsements.

Because issues of fact and law are common to the Netherlands Scheduled Person Endorsement and the Netherlands Blanket AI Endorsement, the Court begins by construing these together. The Court then construes the Netherlands Completed Operations Endorsement. The Court finds that none of Mayer Brown, 1221 Holdings, or J.T. Magen qualifies as additional insureds under the Netherlands Policy. It accordingly does not have occasion to reach the ensuing issue of coverage primacy.

**A.    The Netherlands Scheduled Person and Blanket AI Endorsements**

**1.    Relevant Excerpts**

The Netherlands Scheduled Person and Blanket AI Endorsements share a common feature salient here. Both preclude additional insured status and/or coverage for liability arising out of Division Ten's operations under the following circumstances: where (1) the bodily injury occurs (2) after the portion of Division Ten's work out of which the injury arose has been put to its intended use (3) by any person or organization other than another contractor or subcontractor working on the same project (the "Intended Use Provisions"). As relevant here, the two endorsements, including their Intended Use Provisions, provide as follows:

*The Netherlands Scheduled Person Endorsement.* The Netherlands Policy explicitly lists "JT MAGEN & COMPANY INC, 44 WEST 28TH ST, NEW YORK NY 10001"[3] as an

---

[3] This is J.T. Magen's corporate address. *See* Travelers Reply at 6–7; Netherlands Reply at 4–7; *see also* JSF ¶ 10. Netherlands argues that any coverage pursuant to this endorsement is limited to work performed at that designated location—that is, J.T. Magen's corporate address. Because the incident from which Shuku claims injury undisputedly took place elsewhere—at 1221 Avenue of the Americas—Netherlands argues that this endorsement cannot apply here. Because the Court finds on independent grounds that this endorsement does not extend coverage to J.T. Magen (or Mayer Brown or 1221 Holdings) as an additional insured, the Court has no occasion to reach this issue.

additional insured—but subject to the Netherlands Scheduled Person Endorsement, which reads, in relevant part:

    **A. Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

        1. Your acts or omissions; or

        2. The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

    **B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

      This insurance does not apply to "bodily injury" or "property damage" occurring after:

        1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

        2. *That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.*

JSF ¶ 11 (emphasis added).

    ***The Netherlands Blanket AI Endorsement***.  The Netherlands Policy modifies the scope of the commercial general liability subject to the Netherlands Blanket AI Endorsement.  It reads, in relevant part:

    **A.** Paragraph **2.** under **Section II - Who Is An Insured** is amended to include as an insured any person or organization whom you have agreed to add as an additional insured in a written contract or written agreement.  Such person or organization is an additional insured but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions or the acts or omissions of those acting on your behalf in the performance of your ongoing operations for the additional insured that are the subject of the written contract or written agreement provided that the "bodily injury" or "property damage" occurs, or the "personal and advertising injury" is committed, subsequent to the signing of such written contract or written agreement.

A person's or organization's status as an additional insured under this endorsement ends when:

   a. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

   b. *That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.*

The insurance provided by this endorsement applies only if the written contract or written agreement is signed prior to the "bodily injury" or "property damage". . . .

**B.** With respect to the insurance provided by this endorsement, the following are added to Paragraph **2. Exclusions** under Section **I** – **Coverage A** – **Bodily Injury and Property Damage Liability**:

This insurance does not apply to:

. . . .

   4. "Bodily injury" or "property damage" occurring after:

   a. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

14

> **b.** *That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.*

*Id.* ¶ 13 (emphasis added).

### 2.   Analysis

The parties dispute whether the Intended Use Provisions apply here and thus bar coverage to J.T. Magen, Mayer Brown, and 1221 Holdings as additional insureds under the Travelers Policy. Netherlands argues that there is no dispute that, as of the date and time of Shuku's alleged injury, the portion of Division Ten's work in the Mayer Brown bathrooms that allegedly caused that injury—involving the installation of partitions between stalls—had been "put to its intended use." Netherlands Mem. at 13–14, 19–20. Travelers argues that "[t]he record evidence . . . firmly establishes the opposite." Travelers Reply at 3.

"In order to determine the applicability of the Intended Use [Provisions], the Court must determine the significance of the terms '[t]hat portion' and 'intended use.'" *U.S. Underwriters Ins. Co. v. Image by J & K, LLC* ("*U.S. Underwriters*"), 335 F. Supp. 3d 321, 337 (E.D.N.Y. 2018). As to the first term, "by its very definition, 'portion' suggests that [Division Ten's] work 'can . . . take place in a piecemeal manner.'" *Id.* (quoting *Nautilus Ins. Co. v. Bd. of Dirs. of Regal Lofts Condo. Ass'n*, 764 F.3d 726, 734 (7th Cir. 2014)). "The term suggests that as [Division Ten] perform[ed] its duties, the Intended Use [Provisions] exclude[] from coverage 'each part of the work that has been put to its intended use.'" *Id.* (quoting *Nautilus Ins. Co.*, 764 F.3d at 734). Thus, the question here is whether the portion of work that allegedly caused Shuku's injury had been put to its intended use at the time of the incident.

Contrary to Travelers's position, the record evidence establishes just that. Division Ten's work pursuant to the Purchase Order was to install toilet partitions. JSF ¶ 33. The toilet

partitions in the 12th floor bathrooms, indisputably, had been put to their intended use—they were installed and used by bathroom patrons—by the time a bathroom stall allegedly fell in on Shuku, injuring her. Two portions of the record give rise to the unavoidable inference that non-contractors were using the bathroom facilities as of that point, and thus that the partitions had been put to their intended use of sectioning off stalls. *See U.S. Underwriters*, 335 F. Supp. 3d at 338 ("[T]he phrase 'put to its intended use,' in the context of janitorial services, should encompass the opening of the [p]remises to customers, even if defined in a manner most forgiving to potential insureds.").

First, it is undisputed that Shuku, at the time of her alleged injury, was performing janitorial services in Mayer Brown's offices on the 12th floor. JSF ¶¶ 18–19, 47. It was while cleaning those bathrooms that, she alleges, a bathroom stall door fell off a stall and hit her. *Id.* ¶ 47. It is also undisputed that Shuku was, at the time, an employee of Pritchard Industries—that is, an outside provider of janitorial services to Mayer Brown. *See id.* ¶ 48. From the fact of Shuku's presence late at night cleaning the Mayer Brown bathrooms, *see id.* ¶¶ 18–19, 47, arises the inference—the only reasonable one—that Shuku was cleaning bathrooms that needed upkeep, that is, ones in use by individuals during the day. Travelers, despite the opportunity, has not adduced any evidence on which to infer that she was performing janitorial service in the bathrooms in the midst of the construction process. Nor has it adduced support for an inference that Shuku was cleaning the stalls in preparation for their first post-construction use. (And had her presence been required for this purpose, it stands to reason that that work could have been performed during the daytime.) Travelers is tellingly silent as to what other purpose Shuku might have had for performing janitorial services in the stalls. *See* Travelers Reply at 3–4.

Second, email correspondence between Mayer Brown, and Division Ten and J.P. Magen, establishes that the bathrooms had been put to their intended use before Shuku's injury. This correspondence expressly concerned issues in the bathrooms affecting patrons then heeding nature's call. *See* JSF ¶¶ 57–60. On March 6, 2015 (four days before Shuku's injury), a representative of Mayer Brown emailed a J.T. Magen representative, stating in part:

> Last week we had at least 2 people (that I know of) get stuck in a bathroom stall on the 12th and 11th floors. Today, one of our maintenance clerks was stuck in a stall on the 14th floor. Lucky for him, he had a screw driver and was able to get out without additional help. Please schedule your contractor to come back first thing next week to service all bathroom locks in the men and women rooms on floor [unreadable] need to sign [unreadable] fully operational and are [unreadable] manufacturer's specifications.

*Id.* ¶ 59 (bracketed materials in original). On March 7, 2015, a J.T. Magen representative forwarded the message from Mayer Brown to a Division Ten representative. *Id.* On March 9, 2015, a Division Ten representative wrote back to the J.T. Magen representative, stating, "[W]e just want to make sure that any 'punch list'/warranty items are fully covered off." *Id.* ¶ 60.

It is, further, undisputed that this email exchange occurred three months after the completion of Division Ten's work on "the furnishing and installation of the toilet partitions"—work that "was completed by December 19, 2014." *Id.* ¶ 36. In this context, the exchange occasioned by the report of "2 people" getting stuck in a bathroom stall could be found by a reasonable jury to mean just one thing: that ordinary bathroom users (law firm's employees or visitors) had become stuck in the bathroom stalls while trying to use them for their intended purpose. That one of the issues raised involved the bathroom locks getting stuck makes all the more reasonable the inference that the persons inside were using the toilets to relieve themselves, as opposed to being present to do ongoing construction work.

Travelers responds by emphasizing the second half of the email (which asks that a "contractor" return to service the locks) and the ensuing exchange between Division Ten and J.T.

17

Magen (referencing a "punch list" and "warranty items"). This exchange demonstrates, it argues, that, although "most of the work originally called for in the bathrooms under the original Purchase Order may have been completed at the time of the alleged accident, Division Ten's work on the project was not yet complete at the time of the alleged injury." Travelers Mot. at 2.

That reading, however, does not carry the day for Travelers. That Division Ten had been called upon to attend to "punch list" correctives in the bathroom at the time of Shuku's alleged injury does not nullify the exclusions in the two Netherlands endorsements. Relevant here, these exclude from coverage circumstances when "that portion" of work "out of which the injury or damage arises has been put to its intended use" by a non-contractor. That errors or non-conformities had been spotted with the work so as to require a post-completion return visit by a contractor or sub to address these "punch list" items—a phenomenon familiar to anyone who has renovated a home or office—is not inconsistent with regular usage of the premises having by then resumed. Here, as the email exchange clearly reflects, patrons had begun to put the stalls in Mayer Brown's offices to their intended use. The Subcontractor Change Order also does not provide a non-speculative basis to find that construction work—as opposed to attending to "punch list" deficiencies following the resumption of the bathroom's ordinary intended use— was ongoing around the time of Shuku's injury. And most critically, there is no dispute that Division Ten's only responsibility pursuant to the Purchase Order was to install the toilet partitions, JSF ¶ 33, and that that portion of the work had been completed by December 19, 2014, *id.* ¶ 36.

Travelers thus has not identified a triable issue of fact that, if resolved in its favor, could nullify these exclusions. Indeed, the case law has routinely held that even where change orders were required to enable a subcontractor to address substantial defects, the existence of defects

requiring remediation did not block a determination that the subject of the construction work had been put to its intended use. *See, e.g., J.Z.G. Res., Inc. v. King*, 987 F.2d 98, 101 (2d Cir. 1993) (holding roads to be put to their intended use despite substantial defects); *Emp'rs. Ins. Co. of Wausau v. Northfield Ins. Co.*, 150 F. Supp. 3d 196, 201 (E.D.N.Y. 2015) (holding door put to intended use despite alleged defects, as it was in use by the plaintiff in underlying action).

The Court therefore holds, on the summary judgment records, that neither endorsement can be read to extend liability coverage to Division Ten as an additional insured.

## B.    The Netherlands Completed Operations Endorsement

The Netherlands Completed Operations Endorsement, subject to specified terms and conditions, extends coverage to individuals and organizations whom Division Ten has "agreed to add as an additional insured in a written contract or written agreement" with respect to liability for "bodily injury" or "property damage" caused by Division Ten's work "performed for that additional insured *that is the subject of the written contract or agreement*." JSF ¶¶ 14–15. It reads, in relevant part:

> A. Paragraph **2.** under **Section II - Who Is An Insured** is amended to include as an insured any person or organization whom you have agreed to add as an additional insured in a written contract or written agreement. Such person or organization is an additional insured but only with respect to liability for "bodily injury" or "property damage":
>
> > 1. Caused by "your work" performed for that additional insured that is the subject of the written contract or written agreement; and
> >
> > 2. Included in the "products-completed operations hazard". The insurance provided by this endorsement applies only if the written contract or written agreement is signed prior to the "bodily injury" or "property damage".

*Id.* ¶ 15.

The parties dispute whether J.T. Magen, Mayer Brown, and 1221 Holdings qualify as additional insureds under this endorsement.  This dispute centers on the meaning and application here of the word "signed"—in subparagraph A(2) above—in connection with an outside "written contract or written agreement" that triggers coverage under the endorsement.  *Id.* ¶ 15.  Although the parties spar over the correct interpretation of this term, it is common ground that the only possible "written contract or written agreement" that could qualify here is the Purchase Order.[4]  It is also common ground that, as of Shuku's injury, only Division Ten had signed the Purchase Order.  Mayer Brown and 1221 Holdings never signed it.  And J.T. Magen signed it years later.  *Id.* ¶¶ 23–24, 30.

Netherlands argues, simply, that "signed," as used in its policy, requires that both parties have manifested intent to be bound by physically applying signatures to a document so binding them.  It points the Court to Second Circuit authority thusly construing the term "executed"—of which, Netherland contends, "signed" is necessarily a subset.  *See* Netherlands Reply at 8–9 (noting absence of case law applying the word "signed"); Netherlands Mot. at 16–17.  Travelers counters that, although neither the Purchase nor any other document manifests a signature by any of the three above entities, there is extrinsic evidence, in the form of conduct, on which a finder of fact could conclude that Division Ten and J.T. Magen, as of Shuku's injury, intended to be so bound.  Travelers argues that where conduct can establish such a subjective meeting of minds, this evidence should be read to supply the necessary "sign[ing]."  *See* Travelers Mot. at 14–15.

---

[4] The Certificates of Insurance do not qualify, as these are not contracts or agreements, but "are merely evidence of a contract for insurance, not conclusive proof that the contract exists, and not, in and of itself, a contract to insure."  *Hom Maint. Corp. v. Aetna Cas. & Sur. Co.*, 225 A.D.2d 443, 444 (1996).

Travelers's bid to introduce extrinsic evidence raises a threshold question of policy construction—in particular, whether the term "signed" is ambiguous so as to open the door to such proof. Travelers's analysis, however, skips this vital step in policy construction. It asks the Court to examine extrinsic evidence about the intent of the policy holder and its subcontractor without a threshold finding of textual ambiguity. That request offends first principles of policy construction. Under settled law, only if a policy term is ambiguous and not reasonably susceptible to only one meaning does the Court have a charter to consider parol evidence of the course of conduct of the parties to that agreement. *See 239 E. 79th Owners Corp. v. Lamb 79 & 2 Corp.*, 30 A.D.3d 167 (2006); *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569–70 (2002).

As to that policy construction issue, New York law forecloses the argument that extrinsic evidence of a meeting of the minds could establish a writing, let alone a signature on a writing. As the Appellate Division has held, whether "an unsigned contract may be enforceable if there is objective evidence the parties intended to be bound or the eventual writing was intended to be valid retroactively has no bearing on whether there is a 'written contract' pursuant to the policy endorsement." *Nat'l Abatement Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 824 N.Y.S.2d 230, 232 (2006).

New York law further underscores that although an insurance policy such as the one here may reference an external document like the Purchase Order as the document that must be "signed," the meaning of the term "signed" in a policy must come from the policy itself. This meaning may arise from the policy's plain language or the application of tools of construction, or if these leave that term ambiguous, from extrinsic evidence of the shared understanding of the insurer and the insured as to that term's meaning. "An insurance policy is a contract between the insurer and the insured. Thus, the extent of coverage (including a given policy's priority vis-à-

vis other policies) is controlled by the relevant policy terms, not by the terms of the underlying

trade contract that required the named insured to purchase coverage." *Bovis Lend Lease LMB,*

*Inc. v Great Am. Ins. Co.*, 53 A.D.3d 140, 145 (1st Dept. 2008).

      For this reason, the extrinsic evidence to which Travelers points—the course of dealings

between policyholder Division Ten and its subcontractor J.T. Magen—is irrelevant to this

threshold question of policy construction. Such evidence could come into play only if the Court

first construed the term "signed" as agreed to by Netherlands and Division Ten to be satisfied not

merely by a signature, but alternatively by a course of dealings by the insured (Division Ten) and

its subcontractor manifesting a shared intent at the time of the Purchase Order that additional-

insured coverage under the Netherlands Policy be extended to the sub (here, J.T. Magen).

      The Court therefore assesses whether the policy term "signed," as used in the policy to

modify the term "written contract or written agreement," is ambiguous. If it is not, the Court

cannot disregard "the plain meaning of the policy's language . . . in order to find an ambiguity

where none exists." *Empire Fire & Marine Ins. Co. v. Eveready Ins. Co.,* 48 A.D.3d 406, 407

(2008).

      The word "signed" is not defined in the policy between Travelers and Division Ten.

That, however, does not make it ambiguous. The Court instead is to give such a term "its

ordinary meaning, such as the average policy holder of ordinary intelligence, as well as the

insurer, would attach to it," keeping in mind that the term "cannot be deemed to have been used

as a word of art with legalistic implications." *Cougar Sport, Inc. v. Hartford Ins. Co. of*

*Midwest*, 737 N.Y.S.2d 770, 773 (2000) (cleaned up), *aff'd*, 288 A.D.2d 85 (2001). And

"[w]here an agreement on its face is reasonably susceptible of only one meaning, a court is not

free to alter the contract to reflect its personal notions of fairness and equity." *Bros. v. Excelsior*

*Ins. Co.*, No. 16 Civ. 3658 (SJF) (SIL), 2018 WL 1750468, at *5 (E.D.N.Y. Feb. 23, 2018),

*report and recommendation adopted sub nom. Campo Bros. v. Excelsior Ins. Co.*, No. 16 Civ.

3658 (SJF) (SIL), 2018 WL 1521776 (E.D.N.Y. Mar. 27, 2018).

"New York courts commonly use dictionary definitions to determine such meanings."

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 171 (S.D.N.Y.

2015); *see, e.g., Mazzola v. Cty. of Suffolk*, 533 N.Y.S.2d 297, 297 (1988) (citing *Allied Chem.

Corp. v. Alpha Portland Indus.*, 397 N.Y.S.2d 480 (1977)); *10 Ellicott Square Court Corp. v.

Mountain Valley Indent. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) (citing, *inter alia, Mazzola*).  The

Oxford English Dictionary defines "signed" as "[to] put a mark on; to mark with a sign of any

kind"; "[t]o confirm the authenticity or validity of (a document, contract, cheque, etc.) by writing

one's signature"; and "to render official by affixing one's signature." *See*

https://www.oed.com/view/Entry/179513?rskey=a2Wtkg&result=1&isAdvanced=false#eid (last

visited February 27, 2023).  The Cambridge Dictionary defines "signed" as "to write your name,

usually on a written or printed document, to show that you agree with its contents or have written

or created it yourself." *See* https://dictionary.cambridge.org/us/dictionary/english/signed (last

visited February 27, 2023).

The case law is in accord.  *See Mesibov, Glinert & Levy, Inc. v. Cohen Bros. Mfg. Co.*,

245 N.Y. 305, 310 (1927) ("[a] signature . . . there must be, and a name, written or printed, is not

to be reckoned as a signature unless inserted or adopted with an intent, actual or apparent, to

authenticate the writing"); *see also Parma Tile Mosaic & Marble Co. v. Est. of Short*, 87 N.Y.2d

524, 527 (1996); *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 56 (1953).  Even in the

advent of the electronic era, where a "signature" requirement often can be met by a *digital*

"signature" or "marking," some such physical manifestation—as opposed merely to oral

manifestations of assent—is needed. *See* 15 U.S.C. § 7001(a) ("with respect to any transaction in or affecting interstate or foreign commerce . . . a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation"); *Belizaire v. Ahold U.S.A., Inc.*, No. 18 Civ. 5020 (LGS), 2019 WL 280367, at *5 (S.D.N.Y. Jan. 22, 2019) ("Under New York law, an electronic signature has "the same validity and effect as the use of a signature affixed by hand." (quoting *O'Callaghan v. Uber Corp.*, 17 Civ. 2094 (ER), 2018 WL 3302179, at 7 n.9 (S.D.N.Y. July 5, 2018))), *aff'd*, 796 F. App'x 51 (2d Cir. 2020).

The Court therefore rejects Travelers's argument that the policy term "signed" is ambiguous. It requires a physical manifestation or marking. Because J.T. Magen never made such, that requirement is not satisfied.

It is, finally, no answer to suggest—and Travelers does not seriously argue—that if the term signature requires a physical manifestation or marking, the Netherlands's signature alone on the purchase order would satisfy the policy requirement of a "sign[ing]." Vitally, under the Netherlands Policy, the item required to be signed was a "written contract or written agreement"—an inherently bilateral document. In that context, as the case law reflects, a requirement of bilateral signing alone would "give effect to the intent of the parties as revealed by the language they chose to use," *Bolt Elec., Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000), and "avoid inexplicable results," *Tencza v. Tag Ct. Square, LLC*, 803 F. Supp. 2d 279, 286 (S.D.N.Y. 2011) (giving "a bilateral meaning" to the term "signing"). In this respect, the term "signed" is distinct from the term "executed," which, as the Second Circuit has noted, can be met unilaterally. *See 10 Ellicott Square Court Corp.*, 634 F.3d at 120 (construing "executed" to mean "that a contract be either signed *or* fully performed" (emphasis added)).

24

And treating a contract as "signed" as long as one party had signed it could yield perverse results. If, for example, the subcontractor alone—and not the insured general contractor—had signed the purchase order, it would open the door to a textual argument that a subcontractor was entitled to coverage as an additional insured, notwithstanding the general contractor's lack of intent to do so (or, potentially, the lack even of an oral agreement among them as to work to be done). The requirement of the Netherlands Policy that the "written contract or written agreement" be signed by both parties ensures clarity and serves to avoid unintended outcomes.[5]

For this reason, the case law has widely construed similar policy provisions relating to additional insureds to require the signature of the alleged additional insured, as well as that of the named insured, in the outside contract referenced by the policy. *See, e.g.*, *Cusumano v. Extell Rock, LLC*, 86 A.D.3d 448, 449 (2011) (holding corporation "not entitled to additional insured status" where insurance policy provided coverage to additional insureds when the named insured has "agreed, in writing, in a contract or agreement that another person or organization be added as an additional insured," but where the construction agreement at issue had not been signed by alleged additional insured at the time of the accident); *Nicotra Grp., LLC v. Am. Safety Indem. Co.*, 48 A.D.3d 253, 253 (2008) (construction agreement unsigned by alleged additional insured did not qualify as a "written contract" that was "executed" prior to the "bodily injury," within the meaning of the insurance policy); *DCM of N.Y., LLC v. Liberty Mut. Ins. Co.*, No. 157114/12 (Sup. Ct. N.Y. Cty. Jan. 31, 2014) (unpublished) (written contract signed before occurrence of the underlying accident by the named insured, but not alleged additional insured, had not been

---

[5] Notably, although such is not cognizable as to the meaning of the Netherlands Policy, the Division Ten Purchase Order contained two lines for signatures—one for it, which was completed, and the other for its subcontractor, which was blank at the time of Shuku's injury. *See* JSF ¶ 23.

"executed" within the meaning of applicable policy); *see also Zurich Am. Ins. Co. v. Endurance Am. Speciality Ins. Co.*, 145 A.D.3d 502, 504 (2016) (distinguishing, in context of determining additional insured status, a "signed" contract from contracts binding a party by the act of "accepting [an] order").

In sum, because the term "signed" in the Completed Operations Endorsement refers to an agreement including signatures of both parties to that agreement, and because the Purchase Order here indisputably contained only Division Ten's signature as of Shuku's injury, JSF ¶¶ 23–24, the Purchase Order is insufficient to trigger additional insured status for J.T. Magen (or Mayer Brown or 1221 Holdings).  Put differently, in this case involving johns, the smoking gun is the absence of a John Hancock.

Accordingly, the Court holds that J.T. Magen, Mayer Brown, and 1221 Holdings did not qualify as additional insureds under the Netherlands Policy as of the time of the incident at issue in the underlying personal-injury state-court action.

## CONCLUSION

For the reasons set out above, the Court (1) denies Travelers's partial motion for summary judgment and (2) grants Netherlands's cross-motion for summary judgment seeking a declaration that Netherlands does not owe J.T. Magen, Mayer Brown, or 1221 Holdings a duty to defend or a duty to indemnify in the underlying personal-injury state-court action.

It is not clear whether Netherlands seeks, as its pleadings suggested, the costs and disbursements of this action.  If so, the Court will require briefing on this discrete issue.  If Netherlands wishes to pursue that relief, by March 15, 2023, it must write a letter to the Court of no more than five pages stating the legal and factual basis for the Court to award such relief. Any response from Travelers, which is not to exceed five pages, is due by March 27, 2023.  In

the event Netherlands does not seek such relief, the Court will promptly issue an order closing this case.

The Clerk of Court is respectfully directed to terminate all pending motions.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 1, 2023
New York, New York

27